

Opinions of the United
States Court of Appeals
for the Third Circuit

9-19-2008

# Burns v. PA Dept Corr

Precedential or Non-Precedential: Precedential

Docket No. 07-1678

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Burns v. PA Dept Corr" (2008). *2008 Decisions.* Paper 437.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/437

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 07-1678

RODNEY BURNS,

Appellant

v.

PA DEPARTMENT OF CORRECTION;
SCI-GRATERFORD;
SECRETARY JEFFREY A. BEARD, PH.D.; DONALD
WILLIAMSON;
DAVID DIGUGLIELMO; THOMAS DOHMAN; MARY
CANINO; JOHN DOES(S);
CONFIDENTIAL INFORMANT #1; CONFIDENTIAL
INFORMANT #2;
ROBERT S. BITNER; LEVI HOSBAND; FRANK REGAN;
TONY WOLFE

Appellees

On appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 05-cv-3462
District Judge: The Honorable Berle M. Schiller

Argued April 9, 2008

Before: SMITH, HARDIMAN, and COWEN, *Circuit Judges*.

(Filed September 19, 2008)
_____

Jeffrey M. Boerger (Argued)
Stan S. Kuruvilla
Jane Lee Huang
Drinker Biddle & Reath LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996

*Counsel for Appellant*

Claudia M. Tesoro (Argued)
Calvin R. Koons
John G. Knorr, III
Attorney General
21 South 12th Street; Third Floor
Philadelphia, PA 19107

*Counsel for Appellees*

_____

OPINION

_____

SMITH, *Circuit Judge*.

The Hohfeldian issue presented in this appeal requires us to determine whether a disciplinary conviction directing that an inmate's institutional account be assessed for medical or other expenses implicates a property interest sufficient to trigger the protections of procedural due process.[1]  Appellant Rodney Burns ("Burns"), while an inmate at SCI-Graterford, a Pennsylvania prison, was accused of assaulting fellow inmate Charles Mobley.  At the conclusion of a prison misconduct

---

[1]Although neither party cited his work, we view our task as "Hohfeldian" because Professor Wesley N. Hohfeld is generally regarded as the first modern proponent of a relational understanding of property rights. *See* Wesley N. Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 YALE L.J. 16 (1913).  As one legal commentator has put it, "[Hohfeld] develop[ed] the now standard idea that property comprises a complex aggregate of social and legal relationships made up of rights, privileges, powers, and immunities. . . . The Hohfeldian view moved quickly from legal theory into the 1936 Restatement of Property and from there into mainstream scholarship and judicial decisionmaking." Michael Heller, *The Boundaries of Private Property*, 108 YALE L.J. 1163, 1191–92 (1999).  The "bundle of rights" theory of property, however, may actually date back even further, to the late 1800s.  *Id.* at 1191 n.146 ("The earliest use of the term 'bundle of rights' appears to be from John Lewis, in his 1888 book, A Treatise on the Law of Eminent Domain: 'The dullest individual among the people knows and understands that his property in anything is a bundle of rights.'") (citation omitted).

proceeding, Hearing Examiner Mary Canino determined that Burns had committed the assault in question and ordered him to serve 180 days in disciplinary custody and to forfeit his prison job. Additionally, and of primary interest on appeal, she assessed Burns' inmate account "for Medical or other Expenses" associated with Mobley's condition after the assault.

Burns unsuccessfully appealed the disciplinary decision to a three-member Program Review Committee, to the Superintendent of the facility, and finally to the Chief Hearing Examiner in the Office of Chief Counsel. On July 6, 2005, Burns filed a *pro se* complaint asserting due process and retaliation claims against the Pennsylvania Department of Corrections and certain named prison officials (collectively, the "Department of Corrections") arising out of the prison's disciplinary proceedings. The District Court appointed counsel and, on January 5, 2007, the parties filed cross-motions for Summary Judgment. On February 6, 2007, the District Court denied Burns' motion for Partial Summary Judgment and granted the Department of Corrections' motion for Summary Judgment.

The District Court stressed that it had "serious concerns that Defendants' actions would not satisfy even those minimal due process requirements [guaranteed to persons in prison]." *Burns v. PA Dept. of Corrections*, No. 05-cv-3462, 2007 WL 442385, at *7 n.2 (E.D. Pa. 2007). Nonetheless, the Court held that Burns was not entitled to such due process protections because he failed to show a deprivation of a cognizable liberty

4

or property interest. This timely appeal followed.

Because we believe that the Department of Corrections' assessment of Burns' inmate account constituted the impairment of a cognizable property interest, we will reverse the District Court's February 6, 2007 order granting summary judgment and remand the case for further proceedings.[2]

I.

In February of 2005, Burns was accused of assaulting a fellow inmate, Charles Mobley ("Mobley"), by throwing scalding water at Mobley's face. Prison officials did not become aware of Mobley's injuries until four days after they occurred, when corrections officers noticed that Mobley had sustained minor burns to his face. A nurse at the facility treated

---

[2]For the sake of clarity, we note that the Supreme Court has held that the impairment of property rights, even absent the permanent physical deprivation of property, is often sufficient to trigger due process protections. *See, e.g.,Connecticut v. Doehr*, 501 U.S. 1, 12 (1991) ("[T]he State correctly points out that these effects do not amount to a complete, physical, or permanent deprivation of real property . . . . But the Court has never held that only such extreme deprivations trigger due process concern. To the contrary, our cases show that even the temporary or partial impairments to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection.").

Mobley's injuries, cleaned his burn, applied triple antibiotic ointment, and administered a Tetanus shot. The record does not indicate that Mobley received or requested any additional medical attention.

After he received treatment for his injuries, Mobley originally identified his assailant as one of the inmates in BA-1022, a cell shared by Ricky Holmes and Walter Dixon. During the investigation that followed, the facility's Security Captain, Thomas Dohman ("Dohman"), interviewed Holmes and placed him in Administrative Custody status while the investigation continued. Thereafter, the Security Department at the facility received two "hotline" calls regarding the incident through a special phone line set up to allow trusted inmates to relay sensitive information. Both of these confidential informants stated that Holmes was not responsible for the assault and that Burns had thrown hot water on Mobley after Mobley engaged in shadow-boxing around Burns.

Dohman indicated that he viewed these reports as credible because (1) he recognized the informants' voices and had received reliable information from them in the past; and (2) Lt. Abdul Ansari ("Ansari") separately told him that other inmates had reported to Ansari that Burns was responsible for the assault. After receiving this information, Dohman interviewed Burns and concluded that Mobley—who was apparently "semi-incoherent" at times—had mixed up Holmes and Burns in his original identification. Accordingly, Dohman placed Burns in Administrative Custody and continued the

investigation. At that point, Dohman received an anonymous letter saying that he had locked up the "right guy." The record does not reflect who wrote the letter, but Dohman believed it was someone other than the two confidential informants who originally identified Burns as the assailant.

On March 7, 2005, Dohman issued a Misconduct Report that charged Burns with assault in connection with the February 10, 2005 incident. The Misconduct Report alerted Burns to the charges against him and indicated that they were primarily based upon information from confidential informants who witnessed him commit the assault. The Report also stated that other inmates had informed Lt. Ansari that Burns had committed the assault. Consistent with facility procedure, prison officials provided Burns with blank forms, along with the Misconduct Report itself, to allow him to request the presence of up to three hearing witnesses (one of whom could be a staff member) and draft his own version of events. Burns submitted a witness request form asking Mobley to testify.

On March 10, 2005, Hearing Examiner Mary Canino convened Burns' misconduct hearing. Burns pleaded not guilty to all charges and submitted his written version of events, which denied any involvement in the assault and requested a review of the Day Room videotapes where the assault occurred. Examiner Canino adjourned the hearing to obtain the videotapes, which she ultimately discovered did not exist. Canino then spoke with Dohman, in camera, to determine the reliability of the confidential informants whose information figured in the

7

Misconduct Report.  Canino did not request the direct testimony of the informants, nor did she review their written statements.  Canino summoned Mobley to testify, but Mobley indicated he was unwilling to do so, even in camera.

Canino reconvened the proceedings against Burns and informed him that (1) she was satisfied that the confidential informants' information referenced in the misconduct report was credible based upon her in camera conversation with Dohman; (2) no videotapes existed; and (3) Mobley had refused to testify.  Burns, who contends that he was in a state of disbelief, did not offer any further defense.  Canino then issued a four-page handwritten decision, in which she determined—by a preponderance of the evidence—that Burns had committed the assault in question.  Accordingly, she ordered him to serve 180 days in Disciplinary Custody and to forfeit his prison job.  Additionally, she assessed his inmate account "for [Mobley's] Medical or other Expenses."

## II.

Before we address the merits of Burns' appeal, we must consider our own jurisdiction.  On April 10, 2008, following oral argument in the case, the Department of Corrections sent a letter to Burns purporting to declare that it would not take any steps to deduct any money from his inmate account as a result of the Mobley incident.  The Department of Corrections thus contends that we lack appellate jurisdiction because any due process claim was rendered moot after this letter was issued.

8

Such assurances, they argue, eliminated any "cloud" that lingered over Burns' inmate account, and therefore also addressed the "basis for Burns' argument to this court, regarding the alleged impairment of his right to security in his inmate account." We cannot agree.

Article III of the U.S. Constitution provides that the "judicial Power shall extend to . . . Cases . . . [and] to Controversies." U.S. CONST. ART. III, § 2. As we have explained, "[t]his grant of authority embodies a fundamental limitation restricting the federal courts to the adjudication of 'actual, ongoing cases or controversies.'" *County of Morris v. Nationalist Movement*, 273 F.3d 527, 533 (3d Cir. 2001) (citations omitted). "'[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216 (3d Cir. 2003) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Further, a "court's ability to grant effective relief lies at the heart of the mootness doctrine. That is, '[i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot.'" *Id.* (citations omitted).

"[A]s a general rule, [however,] 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot.'" *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)

9

(internal citations omitted). To be sure, "jurisdiction, properly acquired, may abate if . . . (1) it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur, and (2) interim relief or events that have completely eradicated the effects of the alleged violation." *Id.* However, it is only "[w]hen both [these] conditions are satisfied . . . that the case is moot . . . ." *Id.*

The Department of Corrections argues that its voluntary promise to refrain from the future seizure of funds from Burns' inmate account, in a letter submitted more than three years after it originally assessed that account for medical and other fees, obviates Burns' interest in the case. Such an argument fundamentally misreads the nature of Burns' due process claims. "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Accordingly, a procedural due process violation is complete at the moment an individual is deprived of a liberty or property interest without being afforded the requisite process. In this case, Burns' injury was therefore complete at the time that his account was originally assessed if we assume that (1) the Department of Corrections impaired a cognizable property interest by virtue of the assessment and (2) the disciplinary process failed to afford him sufficient process.

On that basis alone, the Department of Corrections'

10

suggestion of mootness fails.  A completed violation, if proven, would entitle Burns to at least an award of nominal damages. Moreover, because of the belated nature of the assurance—which was offered more than three years after the original disciplinary hearing and only after oral argument was heard in this case—it is possible that Burns is entitled to a more than nominal award as compensation for the time that his inmate account operated under a cloud.  At most, the Department of Corrections' April 10, 2008 letter serves to stop the clock on potential damages.  As such, we see no evidence that the Appellees' assurances "have completely eradicated the effects of the alleged violation." *Davis*, 440 U.S. at 631.

Additionally, the timing and content of the Commonwealth's letter give us pause  in considering whether "'there is no reasonable expectation . . .' that the alleged violation will recur . . . ." *Id.*  Again, the Department of Corrections' assurances were provided exceedingly late in the game.  This by no means establishes that it would resume pursuit of the assessment at the conclusion of litigation.  But we are more skeptical of voluntary changes that have been made long after litigation has commenced.  *See DeJohn v. Temple University*, No. 07-cv-2220, 2008 WL 2952777, at *3 (3d Cir. 2008).  That is especially true where, as here, an assertion of mootness would serve to preserve a party's favorable ruling before the District Court.  As the Supreme Court has instructed, "[o]ur interest in preventing litigants from attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review further counsels against a finding of

11

mootness here." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000).

We also find it significant that the letter in question is neither sworn nor notarized, and fails to detail the basis for the author's authority. The latter point is relevant, in particular, because Burns argued on appeal that the Department of Corrections is required by law to deduct the type of fees at issue in this case. Such lack of specificity, along with the fact that the Department of Corrections urges us to refrain from vacating the favorable decision entered by the District Court, counsels against the conclusion that the Appellees have met the "'heavy,' even 'formidable' burden" that a party alleging mootness must bear. *United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004).

Standing alone, Burns' allegation of a completed procedural due process claim is sufficient to defeat any assertion of mootness. The timing and content of the Department of Corrections' assurances similarly counsel in favor of jurisdiction, given the stringent burden that must be met to demonstrate mootness based upon a party's voluntary cessation of purportedly illegal conduct. *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) ("The test for mootness in cases [involving voluntary cessation of illegal conduct] . . . is a stringent one."). Accordingly, we are well satisfied of our jurisdiction.

III.

12

The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary. *Carter v. McGrady*, 292 F.3d 152, 157 (3d Cir. 2002). Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). We must draw all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party. *Bailey v. United Airlines*, 279 F.3d 194, 198 (3d Cir. 2002); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

IV.

Burns argues that the District Court erred by concluding that the Department of Corrections' actions did not constitute a deprivation of a protected property interest for purposes of his procedural due process claim. The Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To prevail on a procedural due process claim, a litigant must show (1) that the state deprived him of a protected interest in life, liberty, or property and (2) that the deprivation occurred without due process of law. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989); *Reynolds v. Wagner*, 128 F.3d 166, 179 (3d Cir. 1997). Burns does not allege any liberty violation. As such, the sole issue on appeal is whether the Department of Corrections impaired a protected property

13

interest for purposes of procedural due process.[3]

---

[3]At the outset, we note that determining what constitutes the impairment of a protected property interest for purposes of due process—as we must do here—is a distinct inquiry from determining what constitutes a taking for purposes of the Takings Clause. "Although there are similarities between the private interests that are 'property' under the Takings and Due Process Clauses, the two clauses are not coterminous regarding the definition of property." John G. Laitos, LAW OF PROPERTY RIGHTS PROTECTION: LIMITATIONS ON GOVERNMENTAL POWER, § 9.04 (Supp. 2001). Five Justices explicitly recognized this distinction in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), which involved both a takings and a due process challenge to a federal statute that sought to impose retroactive liability on companies by requiring them to provide retirement benefits for past employees.

In *Eastern Enterprises*, a plurality of the Court, including Justices O'Connor, Scalia, Thomas, and then–Chief Justice Rehnquist, concluded that the statute constituted a taking. The four dissenting Justices—Breyer, Stevens, Ginsburg, and Souter—as well as Justice Kennedy, who wrote a separate concurring and dissenting opinion, disagreed and concluded that the statute did not impair an identifiable "property" interest for purposes of the Takings Clause. *Id.* at 539–40. Of greater importance for purposes of this case, however, both Justice Kennedy and the dissenting Justices recognized that notwithstanding their conclusion that no identifiable property interest had been impaired, the statute might still run afoul of the Due Process Clause. Indeed, Justice Kennedy concluded that the Act in question did violate Due Process. As Justice Breyer

14

"Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an

---

instructed in his dissent, a distinction between what constitutes "property" for purposes of the Due Process and Takings Clauses makes sense because:

> [A]pplication of the Due Process Clause [does not] automatically trigger the Takings Clause, just because the word 'property' appears in both. That word appears in the midst of different phrases with somewhat different objectives, thereby permitting differences in the way in which the term is interpreted.

*Id.* at 557.

This distinction is particularly important where, as here, a litigant alleges the impairment of a particular 'right' out of their 'bundle,' because "[w]hen courts consider whether property has been 'taken,' the entire bundle of rights must be considered the applicable 'property[,]' [whereas] . . . the 'property' that is protected by due process includes any subsidiary property 'right' within the bundle of rights." Laitos, *supra*, at § 5.02[B].  "'Property' as used in the Takings Clause is defined much more narrowly than in the due process clause. Thus, while certain property interests may not be taken without due process, they may be taken without just compensation." Laitos, *supra*, at § 9.04.  We keep this distinction in mind as we address Burns' instant procedural due process claim.

15

independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *see also Phillips v. Washington Legal Found.*, 524 U.S. 156, 163–64 (1998). Thus, courts must look to state law to determine whether a particular claim of right is sufficient to constitute a property interest for purposes of the Due Process Clause. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property . . . is an individual entitlement grounded in state law."); *Roth*, 408 U.S. at 577. As an initial matter, it is clear that "[i]nmates have a property interest in funds held in prison accounts." *Reynolds*, 128 F.3d at 179. Accordingly, "inmates are entitled to due process with respect to any deprivation of money [from their accounts]." *Higgins v. Beyer*, 293 F.3d 683, 693 (3d Cir. 2002) (citations omitted). Burns does not, however, allege a seizure of any funds from his account. Instead, he argues that the Department of Corrections' assessment of his inmate account for "Medical and other Expenses," even absent any attempt to seize the funds, deprived him of his "right to security" in that account.

The Department of Corrections argues that this Court, as well as other courts of appeals, have implicitly rejected this argument in a line of cases recognizing that an actual seizure of funds from an inmate's account is sufficient to establish a property deprivation. For example, they cite to *Higgins v. Beyer*, 293 F.3d 683 (3d Cir. 2002), where this Court held that the deprivation of a property interest occurred at the moment

16

prison officials seized money from an inmate's account. Such an argument misreads *Higgins* and other similar cases, which dealt with obvious physical seizures of property from inmates' accounts and, as a result, did not require a court to reach the type of argument that is advanced here. To be sure, those cases established that a physical seizure of funds from an inmate's account is *sufficient* to constitute the impairment of a property interest, but they did not establish that such a seizure is *necessary*. As such, no court has either accepted or rejected the argument that Burns advances in this case.[4] It appears to be an issue of first impression across the courts of appeals.

The right to security has its roots in the "bundle of rights" theory of property, which both the Supreme Court and the Third Circuit have embraced in numerous cases over the last seventy years. *See, e.g.*, *Dolan v. City of Tigard*, 512 U.S. 374, 393

---

[4]Our dissenting colleague begins his separate opinion, not inappropriately–indeed, to some effect–by quoting an oral argument exchange between the author of this opinion and counsel for Burns. Dissenting Op. at 1. To be sure, this prelude to the dissent demonstrates some tension between the majority's holding and a line of questioning developed during argument. In reply, we can only harken back to words of Winston Churchill when confronted with a similar dilemma: "During a long life I have had to eat my own words many times, and I have found it a very nourishing diet." *See* David Cannadine, In Churchill's Shadow: Confronting the Past in Modern Britain (2003).

(1994) ("As we have noted, this right to exclude others is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'"); *Hodel v. Irving*, 481 U.S. 704, 716 (1987) ("In *Kaiser Aetna v. United States . . .* we emphasized that the regulation destroyed 'one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others.'"); *Andrus v. Allard*, 444 U.S. 51, 65–65 (1979) (referencing a bundle of rights as part of takings analysis); *Henneford v. Silas Mason Co.*, 300 U.S. 577, 582 (1937) ("The privilege of use is only one attribute, among many, of the bundle of privileges that make up property or ownership."); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 160 n.10 (1978) (referencing a bundle of rights as part of due process analysis); *Keystone Bituminous Coal Ass'n v. Duncan*, 771 F.2d 707, 716 (3d Cir. 1985) (referencing bundle of rights as part of takings analysis). Building on the "bundle of rights" theory, Burns argues that the Department of Corrections' assessment of his institutional account, even absent an attempt to deduct funds from it, constitutes an impairment of a right generally recognized as one of the incidents of ownership contained in the "bundle." Specifically, Burns contends that the Appellees' actions impaired his right to security in his inmate account, and thereby impaired his protected property interest in the account itself.

Because we are aware of no precedential authority addressing the right to security, we turn to other sources. Legal philosopher A.M. (Tony) Honoré, a professor at the University of Oxford, has identified a right to security as one of the eleven

18

"standard incidents" of property ownership, stating in pertinent part:

> Ownership comprises the right to possess, the right to use, the right to manage, the right to the income of the thing, the right to the capital, **the right to security**, the rights or incidents of transmissibility and absence of term, the prohibition of harmful use, liability to execution, and the incident of residuarity: this makes eleven leading incidents.

A.M. Honore, *Ownership*, in OXFORD ESSAYS IN JURISPRUDENCE 107 (A.G. Guest, ed. 1961), *reprinted in* Tony Honoré, MAKING LAW BIND: ESSAYS LEGAL AND PHILOSOPHICAL (1987) (emphasis added). By and large, legal commentators appear to have accepted Honoré's list of the incidents of property ownership as the basis for modern ownership. *See, e.g.*, Alan Ryan, PROPERTY 54 (1987) ("[a] legal order recognizes ownership in the full modern sense when [Honoré's 11 incidents] are assigned to a single person."); Abraham Bell & Gideon Parchomovsky, *A Theory of Property*, 90 CORNELL L. REV. 531, 543–46 (2005) ("A.M. Honoré played a decisive role in advancing the bundle of rights metaphor by cataloguing a generally accepted list of the "incidents" of property or ownership."); Denise R. Johnson, *Reflections on the Bundle of Rights*, 32 VT. L. REV. 247 (Winter 2007) ("In the early 1960s, A. M. Honoré wrote an essay on ownership in which he attempted to list the incidents of ownership that have

19

come to be known as the bundle of rights."). Burns focuses on Honoré's sixth incident of property ownership, the right of security, which Lawrence Becker has defined as "immunity from expropriation." Lawrence C. Becker, PROPERTY RIGHTS: PHILOSOPHIC FOUNDATIONS 19 (1977). More specifically, Honoré instructs that:

> An important aspect of the owner's position is that he should be able to look forward to remaining owner indefinitely if he so chooses and if he remains solvent . . . . Legally, this is in effect an immunity from expropriation, based on rules which provide that, apart from bankruptcy and execution for debt, the transmission of ownership is consensual.

Honoré, *Ownership*, *supra* at 171.

Applying that concept here, Burns argues that the assessment of his account constituted a threat of expropriation and thereby impaired his right to security in his inmate account. Moreover, Burns contends that the assessment placed the Department of Corrections in a position analogous to that of a Judgment Creditor and clearly deprived him of a protected property interest for purposes of his procedural due process claim. The Appellees correctly argue that this analogy is imperfect because the amount of the assessment has never been firmly established. We agree with Burns, however, that the Department of Corrections acquired something similar to a

20

money judgment[5] by assessing his inmate account.

The Supreme Court of Pennsylvania has recognized that a money judgment constitutes property in its own right. In *In re Upset Sale, Tax Claim Bureau of Berks County*, 479 A.2d 940 (Pa. 1984), the Supreme Court of Pennsylvania reaffirmed that "a judgment is property and that a judgment creditor's interest cannot be deprived without due process of law." *Id.* at 944 (citing *Pennsylvania Co. v. Scott*, 29 A.2d 328 (Pa. 1942). In reaching that conclusion, the court noted that "judgment creditors are interested in the property of the debtor . . . because they have a right to seize it, sell it, and satisfy the debt from the proceeds of the sale." *Id.* Indeed, the court instructed further that "[i]t is this very right of execution which gives a judgment lien its effectiveness and great value." *Id.* We find this decision significant for two reasons.

First, the legal right obtained by the Department of Corrections through its assessment of Burns' account mirrors the interest held by a Judgment Creditor under Pennsylvania law. Again, the Department of Corrections is correct that this analogy is technically imperfect. For example, the amount of

_____

[5]The Appellees chose not to directly address the merits of Burns' Judgment Creditor analogy in their Brief. Instead, they argued that they do not literally constitute a judgment creditor as that term is defined. Significantly, even the Appellees concede in their Brief that the "DOC may have obtained something akin to a judgment . . . ."

21

the assessment has never been firmly established, as is required for perfection of a money judgment. But such an argument is largely beside the point. If anything, the differences between the Department of Corrections' assessment interest and a traditional money judgment demonstrate that the former is stronger than the latter.

With respect to the amount of the assessment, for example, the Department of Corrections—unlike a putative Judgment Creditor—controls the process through which the amount of medical expenses will be determined.[6] As such, they

---

[6]The Dissent argues that the interest the Department of Corrections acquired through its assessment of Burns' account was not akin to a money judgment because Burns is entitled to a "*Holloway* hearing" before the amount of the assessment can be reduced to a liquidated sum. Dissenting Op. at 10. Where an inmate has been found guilty of misconduct and has been ordered to pay for a financial loss or cost resulting from a violation of written rules governing inmate behavior, the facility's Business Manager is required by regulation to calculate the amount in question. At that point, the Department of Corrections is required to deliver a Notice of Assessment for Misconduct to the inmate. The inmate can then challenge the amount of cost established in the Notice of Assessment for Misconduct by requesting a so called "*Holloway* hearing." *See Holloway v. Lehman*, 671 A.2d 1179, 1180-82 (Pa. Commw. Ct. 1996). However, the inmate may not contest his guilt or innocence at such a hearing. *See* A. 34 (Department of Corrections Inmate Discipline Policy). Moreover, in this case,

possess the unilateral authority to reduce their assessment to a specific dollar amount. Similarly, the Department of Corrections need not rely on third party enforcement of their assessment interest. Instead, they physically control Burns' institutional account and can deduct any assessed fees without resort to an intermediary. To the extent that the Department of Corrections' assessment interest differs from that of a traditional Judgment Creditor, those differences show that the Department of Corrections' interest is actually the stronger and more readily collectable legal right.

Second, the Pennsylvania Supreme Court's recognition of a money judgment as "property" is significant because a corollary to a Judgment Creditor's right of execution is a necessary and inevitable diminution in the economic value of a debtor's property. The use of economics in legal analysis has increased exponentially over the last three decades, with the advent of the law and economics movement. *See* Carrie Menkel-Meadow, *Taking Law and _____Really Seriously: Before, During, and After "The Law,"* 60 VAND. L. REV. 555, 568–70 (2007) (describing the rise of the law and economics movement as a "big bang" in the history of legal studies). Resort to basic economic theory here is not intended, however, to imply that all legal questions should be viewed through a "law and economics" lens. *See* Charles J. Goetz, LAW AND

---

neither the fact nor cost of Mobley's treatment—although not yet formally determined—is a disputed issue.

ECONOMICS: CASES AND MATERIALS 4 (1984) ("Economic analysis is not a single great searchlight that will penetrate and illuminate every nook and cranny of the law, but neither is any other 'approach,' whether it be rooted in ethics, sociology, legal history, or some other discipline that can be brought to bear on legal problems."). We do believe, however, that "certain conceptual tools created by economists for the analysis of explicitly economic transactions can usefully be adapted to the legal environment." *Id*. Moreover, where a legal issue contains an explicitly economic component, as does the instant case, the "language of economics" is not simply useful but highly germane because it allows us to objectively measure and describe the economic result of a particular action.

With both the utility and limitations of applying economic theory to legal analysis clearly in mind, we note that the most basic of economic principles teaches that property subject to seizure—even if the probability and timing of such a seizure is unknown—possesses a lesser present day economic value than property not so encumbered. In economic terms, the "expected value" of an account, for example, decreases depending upon the probability that its funds will be seized in the future. *See* Andreu Mas-Colell et al., MICROECONOMIC THEORY 168–94 (1995) (providing a general discussion of expected value theory); *see also* Hal R. Varian, MICROECONOMIC ANALYSIS 194–95 (3d ed. 1992). Mathematically, the expected value of an account that is currently worth V but is subject to seizure would therefore equal $P*(V) + (1–P)*(V–$ the amount seized), where 'P' equals the

probability that the seizure will not be effectuated.  Mas-Colell, *supra*, at 168–94.

Similarly, the "expected utility" of  Burns' account is also reduced based upon the probability of seizure.[7]  The expected utility theory seeks to measure what an asset, such as Burns' institutional account, is "worth," i.e. what one would pay to buy it.  As with expected value, the expected utility of an asset can also be expressed mathematically.  Here, we again assume that the value of the account is equal to 'V' and the probability of seizure equals 'P.'  The expected utility ('U') then equals $P*U(V) + (1–P)*U(V–$the amount seized$)$.  *See* Lucas, *supra* note 4, at 1429–45.

In the context of real property, a simple example of the relationship between an asset's value or utility and the threat of expropriation can be seen in the divergent market values of an estate held in fee simple versus an estate held subject to an encumbrance.  As with the estate subject to an encumbrance, the economic value of Burns' institutional account was reduced at the time of the Department of Corrections' assessment and remained impaired for upwards of three years.  To borrow from

---

[7]Asset pricing literature suggests that expected utility theory is the appropriate way to measure the "value" of an asset.  *See* Robert E. Lucas, Jr., *Asset Prices in an Exchange Economy*, 46 ECONOMETRICA 1429–45 (Nov. 1978); *see also* Lars Ljungqvist and Thomas J. Sargent, RECURSIVE MACROECONOMIC THEORY (MIT Press, Cambridge, MA, 2000).

Professor Honoré, an "important aspect of the owner's position is that he should be able to look forward to remaining owner indefinitely if he so chooses . . . ."  Honoré, *Ownership*, *supra* at 171.  Burns was denied that aspect of ownership, and was therefore faced with either constantly spending down his account, or potentially losing a portion of his funds through the Department of Corrections' discretionary execution of its assessment.  The existence of such a choice demonstrates how Burns' interest in his institutional account was impaired.[8]

---

[8]The Dissent argues that today's decision opens a "can of worms" by vesting inmates with due process whenever any one of Honore's "incidents" of property are impaired for any length of time and for any reason.  Dissenting Op. at 6.  For example, the Dissent argues that our approach "renders unconstitutional a host of innocuous DOC regulations that limit, without due process, inmates' rights to 'use' and 'transmit' the fund in their accounts" by placing limitations on the number of outside purchases an inmate can make or the types of over-the-counter medications they can purchase.  *Id.* at 6-7.  Similarly, the Dissent argues that pursuant to today's decision,  a DOC regulation that deprives inmates in disciplinary custody of the privileges of enjoying personal property during the term of such custody would automatically trigger due process protections.  As a result, the Dissent contends that our decision is contrary to the Supreme Court's instruction in *Sandin* to "'afford appropriate deference and flexibility to state officials trying to manage a volatile environment' and thereby limit 'the involvement of federal courts in the day-to-day management of prisons.'"  Dissenting Op. at 4 (quoting *Sandin v. Conner*, 515 U.S. 472,

482 (1995)). Respectfully, the Dissent misreads the breadth and import of our holding.

First, we do not hold that any impairment of one of Honoré's "incidents" of property is sufficient to trigger due process protections. We hold only that the Department of Corrections' assessment of Burns' institutional account, which this Court has previously recognized as a cognizable property interest, deprived him of a protected property interest where that assessment (1) placed the DOC in a position analogous to that of a Judgment Creditor; (2) clouded Burns's account for a period of more than three years; and (3) reduced the economic value and utility of that account. Whether the impairment of other so-called "incidents" of property is sufficient to trigger the protections of due process is not before us. If it were, however, we would need to look to state law, as we did here, to determine whether a particular claim of right is sufficient to constitute a property interest for purposes of the Due Process Clause. *Logan,* 455 U.S. at 430 ("The hallmark of property . . . is an individual entitlement grounded in state law."). Property rights, after all, are "not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

Second, we disagree with the Dissent's *in terrorem* contention that our decision will trigger due process protections any time an inmate in disciplinary custody is deprived of access to his private property. That a temporary separation of an inmate from his personal property is analogous to the

27

V.

assessment at issue here, which placed the DOC in a position akin to that of a Judgment Creditor pursuant to state law and reduced the economic value of Burns' account for a period of more than three years is, in our view, too lacking in similitude to carry much weight.

Finally, we note that even if Due Process protections were triggered by the types of "deprivations" the Dissent identifies, our decision in no way compels a conclusion that such deprivations are constitutionally infirm. For purposes of this appeal, the only question we need address is whether the government has deprived Burns of a property interest; we answer that question in the affirmative. The amount of process an inmate is "due" is a distinct inquiry, and we agree that it must be informed by the Supreme Court's instruction in *Sandin* to "afford appropriate deference and flexibility to state officials trying to manage a volatile environment" and limit "the involvement of federal courts in the day-to-day management of prisons." *Sandin*, 515 U.S at 482. As the Supreme Court instructed in *Wolff* , "(t)he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Id.* at 560 (quotation omitted). As such, "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Id.*

28

In sum, we are satisfied that the Department of Corrections' assessment of Burns' institutional account constituted the deprivation of a protected property interest for purposes of procedural due process. Through its assessment, the Department of Corrections attained a status akin to that of a Judgment Creditor. In doing so, it necessarily reduced the economic value of Burns' account for a period of more than three years. That deprivation is sufficient to trigger the protections of the Due Process Clause. As such, we will reverse the District Court's order granting summary judgment in favor of the Appellees and remand for further proceedings consistent with this opinion.

*Rodney Burns v. PA Department of Correction, et al.*

No. 07-1678

HARDIMAN, *Circuit Judge*, dissenting.

Today the Court finds a new property right for purposes of 42 U.S.C. § 1983: an inmate's right to "security" in his prison account. As the following colloquy at oral argument makes plain, this Court becomes the first in the Nation to find such a right:

> JUDGE SMITH: [C]utting to the chase, do you have . . . any authority from this Court or any other Court of Appeals or any other court of record . . . recognizing the right to security that is one of the types of property interests that . . . your arguments suggest[s] are entitled to protection?
>
> MR. BOERGER: Not a specific reference to the right of security. This is a matter of first impression in this Court.

> JUDGE SMITH: So it is . . . really a creature of academic discussion, not a recognized property interest heretofore by any court?
>
> . . .
>
> MR. BOERGER:  Yes.

That no court has previously recognized an inmate's right to security in his prison account does not preclude us from doing so today.  But the absolute lack of precedent in support of such a proposition suggests that we should tread cautiously, and I find no warrant on the facts presented here to establish a new property right.  Accordingly, I must respectfully dissent.

## I.

I begin with several points of agreement with the Majority's scholarly opinion.  First, the Majority correctly rejects the Department of Correction's (DOC) mootness argument.  Second, the Majority has properly framed the question, *i.e.*: whether Burns has shown that he was deprived of a property right recognized by Pennsylvania law without due process. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  I also agree with the Majority that Burns does not allege a deprivation of liberty despite the fact that he was ordered to serve 180 days in disciplinary custody as a result of his

31

administrative conviction. Finally, the Majority properly notes that Burns does not allege a seizure of the funds in his account; in fact, no seizure occurred.

Despite these points of agreement with the Majority, the DOC's mere "assessment" — which has neither been reduced to a liquidated sum nor finally adjudicated — does not implicate a property right recognized under Pennsylvania law.

## II.

Burns does not challenge the DOC's decision to place him in disciplinary custody for 180 days. This restriction on Burns's liberty is plainly more significant than the "cloud" over his prison account, but Burns's strategy to allege a deprivation of property rather than liberty is understandable in light of the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 486 (1995).

In *Sandin*, an inmate serving a 30-year sentence was subjected to an invasive strip search by a prison officer. *Id.* at 474-75. After responding with "angry and foul language," the inmate was charged with disciplinary infractions and brought before an adjustment committee. *Id.* at 475. Without permitting the inmate to present witnesses in his defense, the adjustment

32

committee found him guilty of the alleged misconduct and sentenced him to "30 days' disciplinary segregation in the Special Holding Unit." *Id*. at 475-76. The inmate sued various prison officials, claiming that they deprived him of his liberty without due process of law. *Id*. at 476.

The Supreme Court held that the inmate suffered no deprivation actionable under the Fourteenth Amendment because his disciplinary segregation "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id*. at 486. Our Court followed this approach in *Torres v. Fauver*, where we held that an inmate who "was placed in disciplinary detention for 15 days and administrative segregation for 120 days" was not "deprived of a protected liberty interest." 292 F.3d 141, 151-52 (3d Cir. 2002); *see also Mitchell v. Horn*, 318 F.3d 523, 531-32 (3d Cir. 2003); *Fraise v. Terhune*, 283 F.3d 506, 522-23 (3d Cir. 2002); *Shoats v. Horn*, 213 F.3d 140, 143-44 (3d Cir. 2000); *Asquith v. Dep't of Corr.*, 186 F.3d 407, 411-12 (3d Cir. 1999); *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997). Although *Sandin* and its progeny do not control this case, our definition of Burns's property interest should be consistent with their teachings.

*Sandin* was animated by the Supreme Court's desire to limit the ability of inmates to derive constitutionally protected rights from "prison regulations primarily designed to guide correctional officials in the administration of a prison." *Sandin*, 515 U.S. at 481-82. In one pre-*Sandin* case, for example, an

33

inmate claimed that pursuant to a prison regulation meant to protect prison officials, he was summarily labeled "incorrigible" and deprived of his liberty interest in receiving a tray lunch rather than a sack lunch. *Burgin v. Nix*, 899 F.2d 733, 734 (8th Cir. 1990); *see also Sandin*, 515 U.S. at 482-83 (collecting cases). Responding to such claims, the Supreme Court sought to "afford appropriate deference and flexibility to state officials trying to manage a volatile environment" and thereby limit "the involvement of federal courts in the day-to-day management of prisons." *Sandin*, 515 U.S. at 482. The Court was also concerned that permitting litigants to derive constitutional rights from prison regulations ultimately harmed inmates by creating "disincentives for States to codify prison management procedures." *Id*. To address these concerns, the Court limited the scope of inmates' liberty interests to situations where the state "imposes atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Id*. at 484.

In light of the substantial narrowing of the inmate's liberty interest in *Sandin*, the Majority's decision to broaden the scope of inmates' property interests beyond bounds heretofore recognized by any court of record strikes me as anomalous and unwise. By expanding the scope of property rights to include a right to "security" in a prison account, the Majority elevates the *potential future threat* of execution on a prison account over the *actual detriment* of spending a significant amount of time in disciplinary custody.

Moreover, although I accept the Majority's application of

34

the Hohfeldian "bundle of rights theory of property" in certain contexts, I disagree that it is an appropriate tool for defining the property interests at issue here.[9] As discussed by Honoré, the "bundle of rights" includes eleven incidents of property ownership: "the right to possess, the right to use, the right to manage, the right to the income of the thing, the right to the capital . . . the rights or incidents of transmissibility and absence of term, the prohibition of harmful use, liability to execution, and the incident of residuarity." *See* Maj. Op. at IV. The Majority's holding suggests that the impairment of any one of these incidents constitutes a deprivation of property sufficient to trigger the procedural protections of the Fourteenth Amendment. This approach is problematic for two reasons.

First, it permits inmates to circumvent the Supreme Court's holding that disciplinary segregation does not automatically trigger the procedural protections of the Fourteenth Amendment. *See Sandin*, 515 U.S. at 486. A DOC regulation prohibits inmates from enjoying the privilege of personal property. *See* DC-ADM 801 § 6(A)(3) (June 13, 2008). Under the Majority's Hohfeldian theory, this regulation

---

[9] I note that the Majority cites only takings cases for the proposition that the "bundle of rights theory of property" has been embraced by the Supreme Court and the Third Circuit despite its observation that "what constitutes the impairment of a protected property interest for purposes of due process . . . is a distinct inquiry from determining what constitutes a taking." Maj. Op. at IV.

35

automatically deprives inmates sentenced to disciplinary custody of personal property by impairing their "right to possess" the same during their confinement. By virtue of this deprivation, inmates will always be entitled to due process in conjunction with their placement in disciplinary custody, a result directly contrary to *Sandin*, 515 U.S. at 484-86.

Second, the Majority's approach renders unconstitutional a host of innocuous DOC regulations that limit, without due process, inmates' rights to "use" and "transmit" the funds in their prison accounts. Although by no means an exhaustive list, the following regulations illustrate the can of worms that I fear is opened by today's decision.

One policy limits an inmate's ability to use prison account funds for "outside purchases." DC-ADM 815 § 2(B) (May 12, 2008). Specifically, an inmate is "limited to one [outside] order per month" and must submit a written purchase request for review "by a designated facility official, who will approve or disapprove" it pending "[f]inal approval . . . made upon inspection when the item is received." *Id.* Section 2(A)(3)(d) limits the over-the-counter medications that an inmate is entitled to purchase to those "review[ed] and approve[d]" by the "Bureau of Health Care Services." *Id.* Section 2(A)(7) tasks the "Property Office" with tracking "the number of shoes and sneakers that are delivered to the inmate, for compliance with the purchasing limitations on these products." The foregoing restrictions involve a more direct and substantial impairment of an inmate's property rights than the

36

"right to security," and unlike any impairment suffered by Burns, none of these policies affords an inmate an opportunity to contest the relevant official's decision.

Because these policies impair inmates' rights to "use" and "transmit" funds in their prison accounts — impairments the Majority suggests are deprivations of property — inmates would be entitled to due process with respect to every outside purchase, every bottle of aspirin, and every pair of sneakers. This result is antithetical to the Supreme Court's decision in *Sandin*, which recognized that the "incidents of prison life" involve limitations on the panoply of rights enjoyed by ordinary citizens. 515 U.S. at 485 (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."); *Johnson v. California*, 543 U.S. 499, 510 (2005) ("[C]ertain privileges and rights must necessarily be limited in the prison context.").

Furthermore, the Majority's holding frustrates the Supreme Court's attempt to insulate prison regulations "primarily designed to guide correctional officials in the administration of a prison" from constitutional scrutiny and to "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin*, 515 U.S. at 481-82. Like the regulation that deprived "incorrigible" inmates of potentially-hazardous tray lunches in *Burgin*, 899 F.2d at 734, the purchasing policies described above are surely not "atypical"

37

or "significant" in relation to "the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Accordingly, such regulations should not be interpreted to confer heretofore unrecognized rights upon inmates, but such an interpretation is unavoidable given the Majority's decision today.

In light of the foregoing, I would reject the Majority's conclusion that by clouding his prison account with the "threat of expropriation," the DOC deprived Burns of property. Maj. Op. at IV. This threat to the "security" of his account — which, it should be emphasized, remains to this day an account that Burns is free to access and deplete — is simply not an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

### III.

This is not to say that inmates have no "property interest in funds held in prison accounts," or that they are not entitled to "due process with respect to any deprivation of money" from their accounts. Maj. Op. at IV (citations omitted). I simply contend that Burns's property interest is not so broad and amorphous as the Majority suggests. Given the more limited nature of inmates' property rights *vís-a-vís* ordinary citizens, *see* Part II, *supra*, I would hold, as this Court has previously suggested, that an inmate suffers a deprivation of property "at the moment" the prison "employees seize[] the money in [the] inmate account." *Higgins v. Beyer*, 293 F.3d 683, 694 n.3 (3d Cir. 2002). This sensible rule comports with a Supreme Court

case not mentioned by the Majority.

In *American Manufacturers Mutual Insurance Company v. Sullivan*, a class of employees sued Pennsylvania state officials, claiming that Pennsylvania's Workers' Compensation Act deprived them of property without due process. 526 U.S. at 40, 48 (1999). The Act permitted insurance companies to withhold reimbursements for medical treatment from workers who suffered job-related injuries until private "utilization review organizations" determined that the treatment was "reasonable or necessary for the medical condition of the employee." *Id*. at 46-48 (internal citations omitted). Rejecting the employees' claim that they were entitled to the benefits as soon as the employers' liability was established, the Supreme Court held that the employees "do not have a property interest" in the benefits until they "establish that the particular medical treatment . . . [was] reasonable and necessary." *Id*. at 61.

As in *Sullivan*, Burns's liability for the assault had been established, but the DOC had not attempted to quantify the amount of his liability, which is a prerequisite to deducting money from his account. App'x 33-35. Furthermore, as Burns's counsel admitted at oral argument, the funds in Burns's account remained freely alienable at all relevant times. *See also* App'x 35 (indicating that funds in an inmate's account remain freely alienable until "receipt of a decision imposing an assessment against the inmate" by the Business Manager). In addition, before the DOC could execute its assessment, Burns was entitled to additional process, including: (1) a "*Holloway*

hearing" to determine "the amount of financial loss or costs, *if any*,"[10] and (2) an appeal from this determination. App'x 33-35 (emphasis added); *see Holloway v. Lehman*, 671 A.2d 1179, 1180-82 (Pa. Commw. Ct. 1996). Thus, the DOC cannot deprive Burns of funds in his prison account until it establishes "the amount of financial loss or cost, if any." Because it is undisputed that the DOC never established (or even attempted to establish) this amount, I would hold that Burns has not suffered a deprivation of property.

For the same reason, I would reject Burns's argument that the DOC acquired a property interest in his account as a "judgment creditor" that diminished the economic value of his property. Maj. Op. at IV. As the Majority recognizes, a creditor cannot execute on a money judgment until it is reduced to a liquidated sum. *See id.* Here, it is undisputed that the DOC never established Burns's financial liability, if any. The Majority dismisses this distinction as "beside the point" because the DOC possessed "*unilateral authority* to reduce their assessment to a specific dollar amount" and to "deduct any assessed fees without resort to an intermediary." *Id.* (emphasis added). Much like a judgment debtor in state court, however, Burns is entitled to notice, a hearing, and an appeal before his

_____

[10] Burns argues that once his disciplinary conviction become final, deduction of medical expenses from this account "was required by operation of law." To the contrary, the "if any" language in the regulations suggests that the *Holloway* hearing could result in the assessment of no damages.

account can be debited.[11] *See Holloway*, 671 A.2d at 1180-82; App'x 33-35. If the DOC decides to pursue this course of action, Burns will then be entitled to his day in court. As the District Court stated:

> Should Defendants or other [Department of Corrections] officials seize any funds from [Burns's] inmate account for the payment of medical or other expenses resulting from Mobley's assault, this Court would grant [Burns] leave to re-file his due process challenges to his disciplinary process.

*Burns v. Pa. Dep't of Corr.*, Civ. No. 05-3462, 2007 WL 442385, at *4 n.2 (E.D. Pa. Feb. 6, 2007).

IV.

In the absence of any authority, the Majority turns to scholarly writings to hold that an inmate has a property right in the "security" of his prison account. I cannot abide the Majority's elevation of an inmate's property rights over his

---

[11] Ironically, the rule established by the Majority confers more process upon an inmate than a private citizen. Under Pennsylvania law, a judgment creditor may confess judgment and begin executing on the judgment debtor's assets unless and until the judgment debtor files a petition to open or strike the confessed judgment. *See* Pa. R.C.P. 2956.1.

41

liberty rights as delineated by the Supreme Court in *Sandin*. Likewise, if the property rights inside the prison walls are coextensive with Honoré's "incidents of property," several regulations promulgated by the Department of Corrections to regulate the daily lives of inmates are constitutionally suspect. In addition to these concerns on the merits, I fear that today's decision will spawn a new generation of unwarranted due process challenges akin to those that laid the foundation for *Sandin*. Accordingly, I must respectfully dissent.