PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE
THIRD CIRCUIT
_____

No. 09-2872
_____

RODNEY BURNS,
                              Appellant
v.

PA DEPARTMENT OF CORRECTIONS; SCI -
GRATERFORD; *SECRETARY PENNSYLVANIA
DEPARTMENT OF CORRECTIONS; DONALD
WILLIAMSON; DAVID DIGUGLIELMO; THOMAS
DOHMAN; MARY CANINO; JOHN DOE(S);
CONFIDENTIAL INFORMANT #1; CONFIDENTIAL
INFORMANT #2; ROBERT S. BITNER; LEVI HOSBAND;
FRANK REGAN; TONY WOLFE

*(Pursuant to Rule 43(c), Fed. R. App. P.)
_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civ. No. 2:05-CV-03462-BMS)
District Judge: Hon. Berle M. Schiller


_____


Argued  September 23, 2010

Before: McKEE, Chief Circuit Judge, AMBRO and
CHAGARES, Circuit Judges

(Opinion filed: April 20, 2011 )


_____

Richard E. Coe, Esq. [Argued]
Richard M. Haggerty, Esq.
Drinker, Biddle & Reath, LLP
18th & Cherry Streets
One Logan Square
Philadelphia, PA 19103
        *Counsel for Appellants*

Thomas W. Corbett, Jr., Esq.
Claudia M. Tesoro, Esq. [Argued]
Calvin R. Koons, Esq.
John G. Knorr, III, Esq.
Office of the Attorney General of Pennsylvania
21 South 12th St.
Third Floor
Philadelphia, PA 19107
        *Counsel for Appellees*

_____


**OPINION OF THE COURT**

McKEE, <u>Chief</u> <u>Judge</u>.

Rodney Burns appeals the district court's grant of summary judgment in favor of all defendants in the suit he brought against the Pennsylvania Department of Corrections ("DOC") and several Department employees pursuant to 42 U.S.C. § 1983. For the reasons that follow, we will affirm in part and reverse in part.[1]

**I. Facts and Procedural History**

The background of this dispute has been described in detail by both this court and the district court. *See Burns v. Penn. Dept. of Corr.,* 544 F.3d 279 (3d Cir. 2008) ("*Burns I*"); *Burns v. Penn. Dept. of Corr.*, 2009 WL 1475274

_____

[1] The District Court had jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1341 and 1343. We have jurisdiction over this appeal under 28 U.S.C. § 1291.

(E.D.Pa. May 26, 2009); and *Burns v. Penn. Dept. of Corr.*, 2007 U.S. Dist. LEXIS 8679, (E.D. Pa. Feb. 6, 2007). Accordingly, we will only set forth the facts that are relevant to this appeal.

## A. The Alleged Misconduct

On February 14, 2005, a corrections officer at the State Correctional Institute at Graterford discovered that inmate Charles Mobley had burns on his face that had been caused by another inmate throwing scalding water on him four days earlier. Although Mobley did not know the assailant, he initially said that the inmate who assaulted him occupied cell BA-1022. One of the two occupants of that cell, Ricky Holmes, was placed in administrative custody during the investigation that followed.

SCI Graterford has a special hotline phone number that is given to a select number of inmates who can use it to provide confidential information to corrections officials. Two callers used the hotline to report that Burns, and not Holmes, was responsible for the assault. Defendant Thomas Dohman, Captain of Security at SCI Graterford, believed this information to be credible because he recognized the voices and knew that the callers had previously provided reliable information. Dohman therefore concluded that Mobley had mistakenly identified Holmes instead of Burns because they were similar in appearance and because Mobley, an older inmate, was "semi-coherent" at times, making it plausible that his identification was simply wrong.

Burns claims that when Dohman subsequently interviewed him, Dohman told him that the incident had been recorded on a video surveillance camera and that the videotape showed Burns committing the assault. Dohman disputes this account. He insists that the assault was not recorded and that he never told Burns otherwise.

Although Burns denied any involvement, Dohman issued a misconduct report charging Burns with assaulting Mobley. That report stated that the charges were based on statements from two reliable confidential informants who had witnessed the assault as well as information from other

3

inmates given to another corrections officer, Lt. Abdul Ansari.

## B. Pennsylvania Department of Corrections Disciplinary Scheme

The Pennsylvania Administrative Code establishes a baseline policy for prisons to manage disciplinary infractions. *See generally* 37 Pa. Code § 93.10. As part of that policy, prisons must develop "[w]ritten procedures which conform to established principles of law for inmate discipline" that include, at minimum, "[w]ritten notice of charges," a "[h]earing before an impartial hearing examiner," an "[o]pportunity for the inmate to tell his story and to present relevant evidence," "[a]ssistance from an inmate or staff member at the hearing if the inmate is unable to collect and present evidence effectively," a "[w]ritten statement of the decision and reasoning of the hearing body, based upon the preponderance of the evidence," and an "[o]pportunit[y] to appeal the misconduct decision in accordance with procedures in the *Department of Corrections Inmate Handbook*." *Id.*

The Administrative Code also lists types of sanctions that may be imposed if an inmate is convicted of a disciplinary infraction. 37 Pa. Code § 93.10(a). Depending on the type of misconduct, those sanctions include "[c]hange of cell assignment, including placement in the restricted housing unit or restrictive confinement in a general population cell . . . [,]" "[s]uspension of privileges for a specified period of time[,]" and "[c]hange, suspension or removal from job." *Id.*

Additionally, an inmate found guilty of misconduct can be sanctioned for "[p]ayment of the fair value of property lost or destroyed or for expenses incurred as a result of the misconduct." *Id.* One type of "expenses" that can be "incur[ed] as a result of the misconduct" is medical expenses. The Pennsylvania Administrative Code also establishes regulations for medical treatment of prisoners. *See generally* 37 Pa. Code § 93.12. While the Department of Corrections provides some prisoner medical services for free, other medical services incur a charge. The Administrative Code also provides that "[t]he Department will charge a fee to an

4

inmate for any of the following . . . (4) Medical service provided to another inmate as a result of assaultive conduct engaged in by an inmate to be charged the fee." 37 Pa. Code § 93.12(c). As a result, prisoners who are found guilty of assaults in which the victim needs medical treatment may be required to pay the cost of the treatment.

### C. Burns' Disciplinary Hearing

After Dohman issued the misconduct report, Burns responded by filing timely requests to call Mobley as a witness at his disciplinary hearing and to present the purported videotape of the incident.[2] Both requests were consistent with the prison's disciplinary procedures.

Burns renewed his request for the production of the videotape when his disciplinary hearing began. Mary Canino, the hearing officer, responded by continuing the hearing to investigate Burns' request. Five days later, Canino conducted an *in camera* proceeding during which Dohman told Canino that the incident had not been recorded. However, Canino did not attempt to view the relevant tapes in order to resolve the conflict between that representation and Burns' statement that Dohman had told him that the incident had been recorded.[3] Dohman also testified about the confidential informants

---

[2] The prison had a policy of retaining surveillance tapes for 60 days before reusing them. Based on that policy, and since Burns' request was within that 60 day window, we assume that the tape was still available when Burns made his request.

[3] In her deposition, Officer Canino stated that she could not remember if she viewed the videotape, the videotape did not exist, or if she relied upon Dohman's statement that there was nothing relevant on the videotape. Ex. 3 at 27-28 (Canino deposition). She did indicate, however, that it was her standard procedure to ask the prison official if an incident had been recorded. Ex. 3 at 27 (Canino deposition) ("Q. How would you determine [if there was a videotape to view]" A. . . . I would ask Captain Dohman was there a tape on this incident and he would say 'yes' or 'no.' If there was a tape on the incident, I would review the tape. And if the camera was pointed [away from the incident that occurred, she would indicate that in the record.]")

during the *in camera* proceeding. However, he did not reveal their names to Canino, and Canino did not receive any direct testimony from them, either in writing or in person. Canino also met with Mobley *in camera*, but he refused to testify either *in camera* or at the disciplinary hearing. Canino accepted Mobley's refusal to testify, and did not inquire into why Mobley refused.[4]

Canino then reconvened the hearing with Burns present. She informed Burns that Mobley had refused to testify and that there was no videotape of the incident. She also informed Burns that she found the information from the confidential informants credible and reliable. She then found Burns guilty of the assault. As a result, she imposed the following sanctions: 180 days of disciplinary confinement in a restricted housing unit ("RHU"), and loss of his prison job. Canino also assessed Burns' prison account for the amount of Mobley's medical expenses resulting from the assault. Despite the assessment, prison administrators did not deduct any part of Mobley's medical expenses from Burns' inmate account. Nevertheless, the threat of assessment remained for several years, and that continuing threat was the initial focus of this suit.

## D. Subsequent Procedural History

After his administrative appeals were unsuccessful, Burns filed this *pro se* § 1983 action in the district court claiming that the Pennsylvania Department of Corrections and certain officials violated his due process rights during the prison's disciplinary proceedings when it assessed his prison account.[5] The district court granted summary judgment in favor of the defendants on all counts after concluding that the assessment of Burns' account was not a sufficient liberty or property interest to support a claim under § 1983.

---

[4] Canino speculated that Mobley may have been concerned for his safety, but this speculation was not based on anything Mobley said.

[5] After Burns filed his suit *pro se*, counsel was appointed to represent him.

Burns appealed that judgment, and we reversed and remanded.[6] We held that "the Department of Corrections' assessment of Burns' institutional account constituted the deprivation of a protected property interest for purposes of procedural due process" and "[t]hat deprivation [was] sufficient to trigger the protections of the Due Process Clause." *Burns*, 544 F.3d at 291. However, we remanded the case so that the district court could determine what process Burns was due and whether the disciplinary hearing described above satisfied the procedural protections Burns was entitled to under the Due Process Clause. If the district court found that due process was violated, the question of remedies also needed to be addressed.

On remand, the district court found that Burns' due process rights had been violated by the hearing officer's failure to independently evaluate the credibility of the confidential informants, but it did not find that Burns' procedural due process rights were violated by the hearing officer's refusal to compel Mobley's testimony or by her failure to view the alleged videotape. Despite finding a due process violation, the court found that the state officials were protected by qualified immunity and that Burns could therefore not recover damages from them. *Burns v. PA Dept. of Corr.*, 2009 WL 1475274, *5 (E.D. Pa. May 26, 2009). The court did, however, grant Burns' request for a declaration that his prison account could not be assessed. The district court denied all of Burns' other requests for injunctive relief.

Burns now argues that his right to due process was also violated by the hearing officer's failure to compel Mobley to testify as well as her failure to view the videotape, that the prison officials are not entitled to qualified immunity, and that the district court erred in denying his requests for

---

[6] Following oral argument that occurred during the initial appeal, the DOC sent a letter to Burns declaring that it would not deduct money from his inmate account to assess him for expenses arising from the assault as allowed by the hearing officer's order. The DOC then argued that Burns' appeal was therefore moot. That claim of mootness was rejected. *See Burns*, 544 F.3d at 283.

relief for the harms he suffered as a result of the violation of due process.

## II. Standards of Review

"We review an award of summary judgment *de novo*, applying the same test on review that the District Court should have applied." *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 209 (3d Cir. 2005). On summary judgment, we review "the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). We review the district court's grant of qualified immunity *de novo* as it raises a purely legal issue. *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002).

We generally review a district court's grant of relief for abuse of discretion, but "we must exercise a plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 103 (3d Cir. 1981).

## III. Due Process

It is well established that "[p]risoners . . . may not be deprived of life, liberty or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). However, inmates are generally not entitled to procedural due process in prison disciplinary hearings because the sanctions resulting from those hearings do not usually affect a protected liberty interest. *See Sandin v. Conner*, 515 U.S. 472, 483-84 (1995) (holding that not all sanctions resulting from prison disciplinary hearings affect protected liberty interests). Burns does not assert here that any of the sanctions imposed by Hearing Officer Canino—including his prison transfer, his security level, and his 180-day sentence in the SHU—affects any protected liberty interest. Nor does Burns have a property interest in his prison job.[7]

---

[7] Burns does assert that he is entitled to remedies because of these sanctions based upon his contention that they

8

We have already determined that Burns does have a protected property interest in the assessment of his prison account and was therefore entitled to due process prior to the assessment of his account. *See Burns*, 544 F.3d at 291 ("[W]e are satisfied that the Department of Corrections' assessment of Burns' institutional account constituted the deprivation of a protected property interest for purposes of procedural due process.").

Pennsylvania's Administrative Code allows an inmate's account to be assessed in two different circumstances. First, the Code establishes that if an inmate is found to have engaged in misconduct, the "sanction" may include "[p]ayment of the fair value of property lost or destroyed or for expenses [including medical expenses] incurred as a result of the misconduct." 97 Pa. Code § 93.10(a). Elsewhere, the Code requires that the Department of Corrections "will" charge that inmate's prison account for the costs of treating his victim's injuries.

As noted, we held in *Burns I,* that "a disciplinary conviction directing that an inmate's institutional account be assessed for medical or other expenses implicates a property interest sufficient to trigger the protections of procedural due process. . .". 544 F.3d at 280. Thus, Burns was entitled to procedural due process at his disciplinary hearing because assessment of his inmate account for the costs of Mobley's medical expenses was a possible consequence of conviction of the infractions he was charged with.

However, the parameters of that due due process are not readily defined because loss of liberty is a normal consequence of a criminal conviction. *See Sandin,* 515 U.S. at 487 ("The regime to which he was subjected as a result of the misconduct hearing was within the range of confinement to be normally expected for one serving [a prison sentence]").

On remand, the district court found that Hearing Officer Canino had violated Burns' right to due process by relying on the statement of two unnamed confidential informants without independently evaluating their reliability

were the result of a constitutionally flawed hearing. This issue is discussed more fully in Part V.

and credibility. *Burns*, 2009 WL 1475274, *13-14. The Commonwealth does not appeal that ruling. However, Burns appeals the district court's conclusion that Canino's refusal to personally view the videotape and her refusal to force Mobley to testify also violated Burns' due process rights.

Burns claims that *Wolff v. McDonnell*, 418 U.S. 539 (1974), should govern our due process inquiry into the procedural protection he was due in his prison disciplinary hearing. In *Wolff*, the Supreme Court outlined the basic process inmates are entitled to when prison officials seek to deprive them of good-time credits, a protected liberty interest. The district court's due process analysis was based on *Wolff*. *Burns*, 2009 WL 1475274, *10.

The Commonwealth argues that *Wolff* does not apply. It claims that "no decision by the Supreme Court has found *Wolff* applicable in an inmate's deprivation-of-property case." Appellee's Br. at 23. The Commonwealth thus attempts to distinguish between deprivations of liberty and deprivations of property and argues that *Wolff* only applies to the former while two other Supreme Court cases - *Paratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986), and *Hudson v. Palmer*, 468 U.S. 517 (1984) - apply to the latter.

We are not persuaded. *Wolff* itself notes that its due process analysis applies regardless of whether the deprivation is of liberty or property: "This analysis as to liberty parallels the accepted due process analysis as to property. The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived for his property interests. . . . We think a person's liberty is equally protected [as that of his or her property] . . . ." 418 U.S. at 557-58.

Moreover *Paratt* and *Hudson* only address *post-deprivation* remedies of unauthorized or unintentional deprivations of property. Unlike *Wolff*, which addresses the state's obligation to provide *pre-deprivation* notice and a hearing, *Paratt* involved a prisoner's mail packages being negligently misplaced, 451 U.S. at 529, and the process due after that deprivation. *Hudson* extended this post-deprivation analysis to the process an inmate is due after a prison guard's unauthorized destruction of an inmate's property, 468 U.S. at

10

520. Thus, neither case is helpful to our inquiry into the process that should have been afforded *before* the deprivation that occurred here, where pre-deprivation notice and opportunity to be heard were part of an established process.

"[W]e must balance the inmate's interest . . . against the needs of the prison, and some amount of flexibility and accommodation is required." *Wolff,* 418 U.S. at 566. The district court began its analysis by reasoning that

> [t]he newly recognized property interest at issue here – the security of a prisoner's account – is a less important private interest than the good time credits at issue in *Wolff*. . . . The reduction in the economic value of Burns' institutional account and the threat of appropriation, although it lasted three years, was so minor that the Court must conclude that this is a less weighty interest than a possible extension on a term of imprisonment[.]

*Burns*, 2009 WL 1475274, *11. In a footnote, the court further noted that "[h]ad Burns' account actually been assessed, the maximum amount for which he could have been liable was $10.00." *Id.* at 19 n.7.

We do not fully agree with the court's framing of the issue. First, as both the Commonwealth and Burns recognize in their briefs, when Canino assessed Burns' account, she believed that the assessment could be much larger than $10.00, possibly including the costly prospect of covering plastic surgery Mobley may have needed.[8] *See* Appellant's

---

[8] Canino's deposition reads:

"**Q**. And you wrote here that you assessed the inmate's – to assess the inmate's account for medical or other expenses. That would be the medical expenses for Mr. Mobley?

**A**. Plastic surgery or whatever. I'm not a doctor. Whatever it takes to make him right.

Br. at 46 n.15, Appellee's Br. at 16 n.18. Thus, although we now know that Burns' exposure was less than $10, the exposure appeared far more substantial at the time of the hearing.

Second, although a prisoner's interest in freedom is certainly paramount, we are not willing to ignore his/her interest in property,[9] nor are we willing to say that it is so *de minimus* that the requirements of the Due Process Clause are substantially reduced. As we have already noted, the Supreme Court was careful to explain that "a person's liberty is equally protected [as his or her property] . . . ." *Wolff*, 418 U.S. at 557-58.

Rather, we must balance the legitimate interests of both the state and the inmate while affording deference to the unique institutional concerns that arise in the prison setting. *Wolff*, 468 U.S. at 562. The appropriate balance must recognize these competing interests when determining what process is due. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

## A. Documentary Evidence

As noted earlier, during his disciplinary hearing, Burns requested that a videotape of the incident be presented as permitted under prison policy. The requested tape appeared relevant because Burns alleged that Dohman told him that the assault was recorded by surveillance cameras. Burns claims that the videotape would have exonerated him because it would have shown the real assailant. As also noted, Captain Dohman claims he never told Burns there was a videotape, and he told Hearing Officer Canino that the assault had not been recorded. Canino does not remember if she ever viewed the videotape.

---

**Q**. Were there any other expenses you had in mind other than medical expenses.
**A**. I think that was basically it."
Exhibit 3 at 79-80 (Canino deposition).
[9] For example, an inmate's prison account may be the only means of paying for long distance phone calls to family or others in his/her support network.

12

Because we are reviewing a grant of summary judgment, we must view the facts in the light most favorable to the nonmoving party. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d. Cir 1994). We must therefore assume that Canino did not view the videotape. However, we make no assumptions about what, if anything, was then recorded on the videotape.

It is clearly established that due process requires that an inmate be permitted to "present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. Although prison officials are afforded deference regarding whether evidence might be unduly hazardous or undermine institutional safety or correctional goals, "the discretion afforded prison officials is not without limits." *Young v. Kann*, 926 F.2d 1396, 1400 (3d Cir. 1991).

In *Dalton v. Hutton*, 713 F.2d 75 (4th Cir. 1983), the Court of Appeals for the Fourth Circuit dealt with a similar issue. Although that case is not "on all fours" with the circumstances here, the court's analysis is helpful. There, an inmate asked two prison officials to testify in his behalf at disciplinary proceedings arising from a prison disturbance; both guards declined. Pursuant to the applicable prison regulations precluding inmates from calling any prison employees as witnesses, no efforts were made to compel their testimony.[10] On appeal, the court found the regulation inconsistent with the inmate's right to due process because

> [o]ne needs no 'right' to call a witness who voluntarily presents himself to testify. If there is preclusion of an entire class of witnesses (i.e., anyone who would rather not appear), the right is dissipated in a cloud of verbiage. An inmate granted the right, albeit qualified, to call witnesses in his behalf loses it altogether, in any meaningful employment of language, if any witness may refuse to testify for no reason whatsoever.

---

[10] The court focused on the fact that the applicable regulation was a "*per se* proscription against the calling of all but voluntary witnesses." *Dalton*, 713 F.2d at 77.

13

*Id.* at 78.

An inmate's right to present documentary evidence is similarly undermined if prison officials can bar the inmate from presenting the evidence simply by denying that the evidence is relevant. If a disciplinary hearing is to have any substance, the hearing officer must determine relevance of evidence, not corrections officers or employees. *See Young v. Kann*, 926 F.2d 1396, 1402 (3d Cir. 1991) (discussing *Helms v. Hewitt*, 655 F.2d 487 (3d Cir. 1981), *rev'd on other grounds*, 459 U.S. 460 (1983), *aff'd on remand*, 712 F.2d 48 (3d. Cir 1983)). Deferring such a determination to the charging corrections officer turns the disciplinary proceeding into little more than the administrative equivalent of a "show trial." A "right" to present evidence is no right at all if the officer overseeing a disciplinary hearing can simply decide not to view the evidence based on a representation of the prosecuting corrections officer.

It is therefore troubling that the hearing officer here appeared to rely entirely on the statements of Officer Dohman in determining whether the videotape was relevant. The problem is compounded by the fact that the record suggests that Officer Dohman may not even have been under oath when he told Canino about the videotape.

Burns was thus deprived of due process because his right to present evidence was completely undermined by the hearing officer's failure to independently determine whether the evidence was relevant.

We therefore hold that an inmate's right to procedural due process is violated when a hearing examiner simply fails to view available evidence to determine its relevance and suitability for use at a disciplinary hearing. If such hearings are to have any substance, the hearing officer must independently assess whether the evidence is relevant and then determine whether there are legitimate penological reasons to deny the prisoner access to the evidence requested.[11] Although the government may have a very real

---

[11] This does not, of course, mean that prison officials must indefinitely preserve anything which may become evidence in a disciplinary proceeding. Rather, where, as here,

14

interest in barring an inmate's access to certain documentary evidence, that interest is not implicated when it is provided only to the hearing officer, who can then independently assess its probative value and weigh that against any institutional concerns that may counsel against allowing otherwise probative evidence to be used at the hearing.

**B. Mobley's Testimony**

Burns also claims that he was denied procedural due process when Hearing Officer Canino denied his request to call Mobley as a witness. The prison's policy allows an inmate to call up to three relevant witnesses, including one staff member. Burns requested only Mobley's testimony.

From what we have already stated, it should be clear that an "inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566. The Supreme Court has cautioned, however, that inmates are not entitled to the full panoply of constitutional rights. Here again, the inmate's right must be balanced against concerns that are endemic to a situation of one inmate testifying against another:

> Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner. It is against this background

an institution's record retention policy suggests that documentary evidence exists, and an inmate properly requests that the evidence be produced at his/her disciplinary hearing, due process requires that the evidence be produced unless the hearing officer makes an independent determination that the evidence is not relevant, or if relevant, should not be introduced because of overriding penological concerns such as security of the institution or safety of prison personnel or other inmates. Here, the prison had a policy of retaining such tapes for 60 days, and the hearing was held well within that time frame. We must therefore assume that the tapes were available for Burns' hearing.

that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments . . . .

*Id.* at 562.

Here, Burns' desire to have Mobley testify was certainly reasonable since Mobley was the victim of the assault and presumably saw his assailant. Hearing Officer Canino appropriately responded by asking Mobley to testify. However, as we have noted, Mobley refused to testify either at the hearing or *in camera*. He also refused to provide any kind of written testimony. Canino did not explain why Mobley refused to testify, and it is not clear that she even knew Mobley's reasons or inquired into them. Canino therefore conducted the hearing and rendered a decision without having the benefit of hearing what the victim knew about the identity of his attacker.

The Supreme Court has explained that "it would be useful for the [prison disciplinary hearing officer] to state [his or her] reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases." *Wolff*, 418 U.S. at 566. However, the Court has also cautioned that institutional concerns, including the possibility of retaliation, may make it wholly impractical to compel an inmate's testimony at a disciplinary hearing. *Id.* at 567.

We will therefore not conclude that a hearing officer must always record the reason for permitting an inmate to refuse to testify. That may sometimes be as problematic as reporting that an inmate refused to testify out of fear of retaliation. These institutional concerns override Burns' interest in being able to call Mobley as a witness. If Burns had been the assailant, Mobley would either have had to testify truthfully and risk retaliation or perjure himself and thereby become the vehicle by which his assailant would escape sanction.

16

In *Dalton*, the inmate wished to call prison officials to testify, but under prison policy they could not be compelled to testify— as noted earlier, all testimony had to be voluntary. *Dalton*, 713 F.2d at 77. While we agree with the Fourth Circuit that the right to call only voluntary witnesses is no right at all, we find no justification for extending this analysis so far that it would force a victim inmate to testify against his/her assailant, nor is *Dalton* to the contrary. The court was there concerned with a *per se* prohibition that did not allow for inmates to require testimony of anyone (including corrections officers), even when that testimony presented no institutional concerns that would have counseled against it.

The Commonwealth's interest in protecting Mobley and managing the difficult relationships within the prison setting far outweigh Burns' right to call Mobley as a witness. *Wolff* requires "a case-by-case analysis of the calling of involuntary witnesses." *See Forbes v. Trigg*, 976 F.2d 308, 317 (7th Cir. 1992). Here, we conclude that the special circumstances involving an inmate victim, and the concerns about the "unwritten code that exhorts inmates not to inform on a fellow prisoner," *Wolff*, 418 U.S. at 562, outweigh the right Burns may have otherwise had to call an unwilling witness. Accordingly, we will affirm the district court's finding that there was no due process violation in allowing Mobley not to testify, but we will reverse the court's finding that Burns' due process right was not violated by the hearing examiner's failure to view the videotape that may have recorded the incident.

## III. Qualified Immunity

Finding that prison officials violated Burns' due process rights does not end our inquiry, however. The question remains whether those officials have qualified immunity. Qualified immunity shields government officials from suit even if their actions were unconstitutional as long as those officials' actions "d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982).

"Qualified immunity balances two important interests—the need to hold public officials accountable when

17

they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably." *Pearson v. Callahan*, --- U.S. ---, 129 S.Ct. 808, 815 (2009). "The general rule of qualified immunity is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 634, 645 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)) (alteration in original). The burden of establishing qualified immunity falls to the official claiming it as a defense. *See Harlow*, 457 U.S. at 819 (describing qualified immunity as a defense and noting that "if the official pleading the defense claims extraordinary circumstances and *can prove* that he neither knew nor should have known of the relevant legal standard, the defense should be sustained") (emphasis added).

For the official to have "fair warning," *United States v. Lanier*, 520 U.S. 259, 270 (1997), that his or her actions violate a person's rights, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

The district court reasoned that, since our holding in *Burns I* (that Burns' property interest in his inmate account was protected under the Due Process Clause) rested upon sources other than our own case law, the right we recognized there was not "clearly established" when the defendants assessed his account. The district court believed that, prior to our holding there, procedural due process only protected an inmate's account when it was debited, and no property interest was implicated by the "mere" assessment of the account. Accordingly, the court reasoned that the defendants were entitled to qualified immunity pursuant to *Saucier v. Katz*, 533 U.S. 194 (2001). *Burns I*, 2007 WL 442385, *5. Although we believe that the question of qualified immunity

18

is a closer call than suggested by the district court's analysis, we will nevertheless affirm that court's holding.

The district court was correct in concluding that our holding in *Burns I* that a prisoner has an interest in the security of his or her prison account was a new understanding of property interests protected by due process rights. However, that does not end our qualified immunity inquiry because "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

To determine whether a new scenario is sufficiently analogous to previously established law to warn an official that his/her conduct is unconstitutional, we "inquir[e] into the general legal principles governing analogous factual situations . . . and . . . determin[e] whether the official should have related this established law to the instant situation." *Hicks v. Feeney*, 770 F.2d 375, 380 (3d Cir. 1985). "This approach eliminates unexpected liability for public officials as well as prevents the occurrence of a mere 'factual wrinkle' in an area of clearly established law from barring suit altogether." *Id.* (quoting *People of Three Mile Island v. Nuclear Regulatory Commissioner*, 747 F.2d 139, 148 (3d Cir. 1984)).

Because qualified immunity is intended to protect officials absent "fair warning" that their conduct violates constitutional guarantees, we examine qualified immunity from the perspective of the official at the time of the violation. We must therefore determine "whether reasonable officials in their positions, with the information then available to them, should have known that their actions or omissions violated clearly established law." *Ryan v Burlington County*, 860 F.2d 1199, 1204 (3d Cir. 1988).[12]

---

[12] *See also Saucier v. Katz*, 533 U.S. at 202 ("The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"); *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (inquiring "whether a reasonable officer could have believed that [his or her action] was lawful, in light of clearly established law and the information that the officers

Here, the question is "whether reasonable officials in [Hearing Examiner Canino's] position, with the information then available to [her], should have known that their actions [in ordering an assessment of Burns' prison account under the circumstances here] violated clearly established law." *Ryan*, 860 F.2d at 1204.

At the time of Burns' disciplinary hearing, it was well established that "[i]nmates have a property interest in funds held in prison accounts." *Reynolds v. Wagner*, 128 F.3d 166, 179 (3d. Cir. 1997) (citing *Mahers v. Halford,* 76 F.3d 951, 954 (8th Cir. 1996); *Campbell v. Miller,* 787 F.2d 217, 222 (7th Cir. 1986); *Quick v. Jones,* 754 F.2d 1521, 1523 (9th Cir. 1985)). Accordingly, it was clearly established that "inmates are entitled to due process with respect to any deprivation of this money." *Reynolds*, 128 F.3d.at 179 (citing *Mahers,* 76 F.3d at 954). To the extent that *Burns I* added a "new twist," it did so by concluding that the position of the Department of Corrections was similar to that of a judgment creditor when it assessed inmates' accounts even if the account was not debited until some point in the future.[13]

Under Pennsylvania law, after an inmate has been found responsible for an assault, "[t]he Department [of Corrections] will charge a fee to an inmate for  . . . [m]edical service provided to another inmate as a result of assaultive conduct engaged in by an inmate to be charged the fee." 37 Pa. Code § 93.12(c)(4). An "assessment [i]s a statutorily

---

possessed."); *Anderson v. Creighton*, 483 U.S. 634, 641 (1987) ("The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.")

[13] In *Burns 1*, although we conceded that the "analogy is technically imperfect," we held that "the legal right obtained by the Department of Corrections through its assessment of Burns' account mirrors the interest held by a Judgment Creditor under Pennsylvania law." 544 F.3d at 588. We also noted that, the position of the Department of Corrections here was even stronger than that of a judgment creditor. *Id.*

20

authorized consequence of [a prisoner's] being found guilty of institution misconduct." *Brome v. Dept. of Corr.*, 756 A.2d 87, 89 (Pa. Cmwlth. 2000); *see also Greene v. Dept. of Corr.*, 729 A.2d 652, 654 (Pa. Cmwlth. 1999).

The Commonwealth Court of Pennsylvania has previously found that the Department of Correction's procedures regarding the assessment of inmates' accounts violated due process. In *Holloway v. Lehman*, 671 A.2d 1179 (Pa. Cmwlth. 1996), the court noted that "[i]t is beyond dispute that money is property. Private property cannot be taken by the government without due process." *Id.* at 1181 (citations omitted). There, the court found the Department's policy of providing no opportunity for inmates to protest the *amount* of money to be deducted from the prisoner's account denied inmates due process of law. The court thus began requiring a hearing that has come to be known as a "*Holloway* hearing."

However, a *Holloway* hearing merely determines the *amount* of money to be assessed from a prisoner's account; it does not provide an opportunity to challenge the fact of the assessment in the first place. That determination is made at a misconduct hearing—such as the hearing over which Canino presided.

A reasonable official at the time of Burns' misconduct hearing would have known, or should have known, that "inmates are entitled to due process with respect to any deprivation of" their prison accounts. *Reynolds*, 128 F.3d at 179 (citing *Mahers,* 76 F.3d at 954). An official should also have realized that the hearing over which Canino presided is the only opportunity under Pennsylvania law for an inmate to challenge whether his or her prison account should be assessed (not merely the *amount* to be debited). Indeed, Pennsylvania officials should have been on heightened notice of the constitutional requirements with regard to such actions because Pennsylvania courts have previously upheld inmates' due process challenges of the assessment procedures. *See Holloway*, 671 A.2d 1179.

Thus, we do not think it is unreasonable for prison officials at the time of Burns' hearing to have known that: (1) Burns had a property interest in his prison account, (2) he was

entitled to due process before his account could be debited, (3) a later *Holloway* hearing would determine the amount of money to be deducted, but the actual disciplinary hearing was the only forum for determining if any money should be deducted at all, and (4) due process is violated when a determination to deprive an inmate of a protected interest is based solely on the uncorroborated statements of confidential informants.

However, two matters give us pause in concluding that Burns is entitled to relief here. First, although it was not unreasonable for a government official to have realized that due process must be provided in adjudicating whether a prison account can be debited, *Burns* is the first case that clearly established that the *assessment* itself implicates a prisoner's protected property interests, even if the account is not actually debited. The devaluation in the property interest in the inmate's funds that results from such an assessment was not clearly established before *Burns I,* and we do not believe that a reasonable official could have foreseen the analogy to a judgment creditor that formed the basis of our holding in *Burns I*. Second, we think it understandable that the existence of a later *Holloway* hearing could have caused a reasonable prison official to believe that, because the Pennsylvania state courts have found that a *Holloway* hearing was *necessary* to satisfy due process, that hearing was also *sufficient* to satisfy due process.

Although some officials may have been able to deduce that a *Holloway* hearing was insufficient to satisfy due process, we do not believe that a reasonable official in Canino's position would have had a "fair warning" that an assessment of the account prior to the *Holloway* hearing was subject to due process protections. Prior to *Burns I*, inmates were only entitled to procedural due process  before their accounts were debited. Neither this court, nor any Pennsylvania appellate courts had held that an inmate was also entitled to procedural due process before the account was assessed, even if the fund was not debited before we decided *Burns I*.

Thus we cannot conclude that the circumstances here were sufficient to give prison officials "fair warning" that

22

their conduct was unconstitutional. *United States v. Lanier*, 520 U.S. 259, 270 (1997). Accordingly, we hold that they are entitled to qualified immunity.

## V. Remedies

Although qualified immunity bars Burns from seeking monetary compensation, he may still be entitled to injunctive relief. *See Harris v. Pernsley*, 755 F.2d 338, 343 (3d Cir. 1985) ("The qualified immunity defense only applies, of course, to claims for money damages.").

Burns argues that the district court should have provided remedies for all of the injuries that flowed from the flawed hearing, and that the remedies should have included: reversing the finding that he assaulted Mobley; remedying the increased security clearance that followed the assault on Mobley; rescinding the order separating him and Mobley that resulted in his transfer; and compensating him for his lost job and wages, and his out-of-pocket expenses resulting from these actions.

However, Burns' "wish list" is not the least bit helpful to our attempt to fashion an appropriate remedy. Prison officials would have been perfectly within their authority had they separated Mobley and Burns after the disciplinary hearing, regardless of its outcome. In fact, prudence may well have required separation even if Burns had been exonerated at the hearing. Prison authorities may still have had legitimate concerns that Burns would attempt to retaliate against Mobley because Mobley refused to exonerate him at the hearing. The same can be said for the order transferring Burns to a different institution. Burns certainly did not have any right to serve his sentence in any particular institution. Prison authorities routinely transfer inmates for reasons of security, convenience or available space. Burns surely did not acquire a vested right to remain where he was housed based upon this incident or the violations of his due process rights that followed. The same is true of his job. Job classifications are uniquely the province of prison authorities,

not the courts, and Burns did not have any vested right to a particular job that a court could enforce.[14]

The Commonwealth argues that because prison officials could have imposed all of these penalties without any process at all, the constitutional violation did not cause any injury to Burns. In the Commonwealth's view, since prisoners have no liberty interests in their prison location, *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976), or placement in restricted housing units, *Sandin*, 515 U.S. at 486, and no property interests in their jobs, prison officials were free to take these actions without any justification at all.

The argument is problematic for two reasons. First, it fails to recognize that these actions resulted from a constitutionally flawed hearing. Second, it assumes that every remedy must be based upon a liberty or property interest. In fact, while the injury must have been proximately caused by a violation of a protected interest, there is no requirement that the remedy be limited solely to that property interest. *See, e.g., Doe v. District of Columbia*, 697 F.2d 1115, 1124 (D.C. Cir. 1983) (finding prisoners whose Eighth Amendment right to be free from cruel and unusual punishment had been violated to be "entitled to compensation for any physical injuries, pain and suffering, emotional distress, and impairment of their prospects for future employment proximately caused by the defendants' unconstitutional conduct" even though there is no property interest in employment prospects).

In order to determine what remedies are appropriate, the Commonwealth asks us to adopt the reasoning of the district court and proceed as if the hearing did not implicate Burns' property interest and therefore did not require any constitutional protections. The district court posed the legal question as: "if the hearing had not implicated Plaintiff's property interest in the security of his account, . . . would the

---

[14] We do not, however, take any position on whether an inmate who loses a particular job or is transferred to a different institution in retaliation for his/her exercise of a constitutional right would have a remedy in that very different situation.

24

disciplinary determination and its subsequent effects be upheld?" *Burns*, 2009 WL 1475274, *8.

However, that does not advance our inquiry. We cannot erase unconstitutional actions in order to uphold steps that were taken because of them. The constitutional violation did occur, and the Commonwealth cannot put that genie back in the bottle.

Rather, we must approach this from the perspective of what would have happened had Burns been afforded the procedural protections to which he was entitled. In advancing their opposing arguments regarding the appropriate remedy, both parties rely on *Carey v. Piphus*, 435 U.S. 247, 260 (1978). The question there was not whether the state could have taken certain actions against a group of students without violating their constitutional right to due process. Rather, the Court considered whether the students would still have been suspended if they had been afforded procedural due process. *See Carey v. Piphus*, 435 U.S. at 260.

*Carey* lays out a helpful burden shifting scheme for resolving the remedial issue here. *See Carey*, 435 U.S. at 260 (describing and approving of the Court of Appeals burden shifting scheme). Under *Carey*, the plaintiff in a § 1983 case must prove that a constitutional violation has occurred, and that it was the proximate cause of his or her injuries. Once the plaintiff clears both hurdles, the burden shifts to the defendant, who then has an opportunity to prove that the same actions would have occurred even if due process had been provided.

Here, as we have explained, Burns has established a procedural due process violation and has pointed to all of the sanctions that resulted from that action. Accordingly, the burden should have shifted to the Commonwealth to show that it would have taken the same steps if due process had been provided. For those actions the prison officials can establish would have been taken regardless of the flawed hearing, the plaintiff is entitled to no remedy, as any remedy would constitute a windfall. However, if the prison cannot establish that it would have taken the same steps even absent the constitutionally flawed hearing, the inmate is then entitled to relief.

25

We believe that had due process been provided, at least one consequence of the flawed hearing would not have occurred: Burns would not have been convicted of misconduct on the evidence presented. The district court found that the evidence was insufficient to assess Burns' account and the state did not appeal that finding.

SCI Graterford has one process for determining whether an inmate is guilty of misconduct and will have funds assessed because of that misconduct. The processes of finding guilt and allocating medical treatment costs are inseparably intertwined in a single proceeding with one adjudicator, one body of evidence, and the same burdens of proof. In fact, the punishment of allocating costs to an inmate appears to flow automatically from the result of the disciplinary proceeding because it appears that an assessment is a *mandatory* consequence of a disciplinary action if the inmate is convicted of the infraction. *See* 37 Pa. Code § 93.12(c)(4) ("The Department [of Corrections] *will* charge a fee to an inmate for . . . [m]edical service provided to another inmate as a result of assaultive conduct engaged in by an inmate to be charged the fee." (emphasis added)). This means that the prison could not have assessed Burns' prison account without a disciplinary conviction, but it also appears that the prison had to assess his account once Burns was convicted of the infraction.

We agree with the district court that there is simply not enough evidence in the record to support the assessment of Burns' account, and the Commonwealth has not appealed that finding. Since the assessment is inextricably intertwined with the finding that Burns committed the charged infraction, we must also conclude that there is simply not enough evidence to support a finding that he was the one who assaulted Mobley. Therefore, we grant Burns' request that the disciplinary conviction be expunged.

Nevertheless, prison officials were entitled to have taken the other actions regardless of the outcome of the disciplinary hearing, and Burns' request to reverse those measures must be denied. As noted above, he would otherwise receive a windfall. He cannot rise above the legitimate institutional concerns of prison officials merely

26

because they did not provide him with a proper hearing. The Commonwealth argues that prison officials may have been wise to impose such sanctions as the separation order and the job changes regardless of the outcome of the hearing for fear of retaliation or other concerns, and we agree. We are mindful that prison officials must make complicated and difficult decisions regarding inmate placement and privileges, and officials should clearly be afforded deference regarding such actions. We are also mindful that the Prison Litigation Reform Act ("PLRA") provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right" and that such relief should be "narrowly drawn," "extend[] no further than necessary to correct the violation of the Federal right, and [be] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C.A. § 3626(a)(1)(A).

Moreover, our "involvement . . . in the day-to-day management of prisons" must be limited. *Sandin*, 515 U.S. at 482. Thus, our holding only disturbs the conviction that resulted from a constitutionally flawed hearing. Consistent with the PLRA, we do not interfere with the prison's day-to-day management of Burns.

## VI. Conclusion

Accordingly, we will affirm the district court's finding that Mobley's refusal to testify did not constitute a due process violation, but we will reverse and hold that it is a due process violation for a prison hearing officer not to seek to view documentary evidence requested by an inmate unless there are legitimate institutional concerns that counsel against it. We will nevertheless affirm the district court's finding of qualified immunity. Finally, we will grant Burns' request to order the misconduct be expunged, but we deny his request for all other relief.